*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JOHNNIE MAE CULLINS,

Plaintiff-Appellant,

v

MGM GRAND DETROIT, LLC,

Defendant-Appellee.

UNPUBLISHED
July 21, 2026
11:37 AM

No. 372052
Wayne Circuit Court
LC No. 22-011043-CD

Before: MARIANI, P.J., and O'BRIEN and WALLACE, JJ.

PER CURIAM.

Plaintiff, Johnnie Mae Cullins, appeals as of right the trial court's order granting the motion for summary disposition filed by defendant, MGM Grand Detroit, LLC. We affirm.

## I. BACKGROUND

Plaintiff was hired by defendant as a pit clerk in July of 2001. She worked in this role until September of 2007, at which time she became a security officer because defendant, according to plaintiff, "had eliminated the pit clerk department."

Plaintiff testified that she had a knee replacement in 2016, after which she had trouble standing for long periods, so she asked for assignments with less standing. Plaintiff further testified that, in 2018, she went to her supervisor at the time—Brian Humphries, who later became a manager—and asked for less standing assignments because standing for long periods "was too much on [her] knee," and Humphries was dismissive and made a comment about plaintiff "always asking for help."

Effective July 1, 2018, the union covering defendant's security guards agreed as part of their collective bargaining agreement that its members would be required to "complete training and testing . . . including a physical agility test, without accommodation." The agreement provided that members would have two opportunities to pass the agility test, and any member who was unsuccessful would be offered a position as an ID checker. Consistent with the bargaining agreement, the job description for defendant's security guard position states that the individual "[m]ust pass Physical Agility test." Defendant's ID-checker position also had physical

-1-

requirements, but they were less stringent. The job description for defendant's ID-checker position lists under "Physical Requirements" the need to be able to stand for "5 hours minimum."

Plaintiff testified that beginning in 2018, she was required to take two tests—a written test and a physical agility test. The agility test, according to Humphries, consisted of running 80 feet, picking up a 30-pound bag, carrying that bag up "42 steps," then running another 100 yards, performing "CPR, just chest compressions for two-minutes," then running another 50 feet to the finish line. All of this had to be completed within four minutes. Plaintiff testified that she passed the required written test but failed the agility test when she first took it in 2018, but defendant passed her anyway. The agility test was to be given annually, so plaintiff had to take it again in 2019. Plaintiff testified that when she took the test in September 2019, she cut her finger and was injured when she fell while running, which caused her to fail. A report prepared following the test reflected that plaintiff received medical care for a cut on her right index finger and a "[s]train of adductor muscle, fascia and tendon of right thigh."

Plaintiff took the test a second time and failed again. Plaintiff said that she took the test a second time against the advice of her doctor because she "wanted to keep [her] job and [her] pay." Plaintiff was given a third opportunity to take the test, but she declined per her doctor's advice. After plaintiff failed the test twice, she was reassigned as an ID checker.

Plaintiff testified that she complained to HR about the agility test because she did not believe it was fair, as defendant passed "some people" that plaintiff knew "couldn't have passed." Plaintiff identified Randy Kol as one such person and Mark Costello as another. Plaintiff admitted, however, that she did not see either Kol's or Costello's actual test results. Plaintiff also acknowledged that Costello became an ID checker in 2019, and she could not say why. Plaintiff further conceded that Mark Wolf, another employee, took the agility test, failed it, and became an ID checker.

On October 22, 2019, plaintiff's medical provider—Dr. Michael Williams—signed a form requesting "a job-related accommodation" for plaintiff. In this form, Dr. Williams averred that plaintiff could "stoop[]" but "can't get on her knees." He also wrote that plaintiff should not lift more than 10 pounds or stand for more than "an hour at a time in an 8 hr day." The form asked Dr. Williams to circle activities that plaintiff's medical condition limited, and Dr. Williams circled, among other things, walking, lifting, and standing. In response to a question asking the doctor to estimate the expected duration of plaintiff's limitations, Dr. Williams wrote that the limitations were "long term and its [sic] unknown if they'll ever go away."

Consistent with this form from Dr. Williams, plaintiff submitted a request for accommodation to defendant on October 28, 2019, which was after plaintiff failed the agility test a second time. In this request, plaintiff wrote that she had a knee replacement on her left knee and that her right knee "also need[s] replacement," so she "cannot [kneel] on hard surfaces." She also wrote that she has difficulty standing for long periods of time due to arthritis in her spine and hip. To accommodate these disabilities, plaintiff requested that she be given an equal amount of time standing/walking and sitting. Plaintiff also wrote that she wanted to ask to be excused from taking the agility test but did not because she did not have the necessary paperwork in order at the time.

On November 5, 2019, apparently after not hearing back from defendant, plaintiff filed a "charge of discrimination" against defendant with the Equal Employment Opportunity Commission (EEOC). In this document, plaintiff wrote that she "requested reasonable accommodation for [her] disability" but defendant denied her request and asked her to perform a physical test that defendant was "aware [plaintiff could not] achieve due to [her] disability." Plaintiff further alleged that defendant "demoted" her for failing this test, and she believed that this demotion and defendant's refusal to provide reasonable accommodations violated the Americans with Disabilities Act.

In a letter dated November 13, 2019, and signed by Susanne Bennett, defendant informed plaintiff that it was granting her an accommodation that restricted her from lifting and kneeling. This notice informed plaintiff that the accommodation was effective starting November 8, 2019, and would last through November 25, 2019, at which time plaintiff "would be expected to take the agility test again."

Plaintiff testified that after she received Bennett's letter, she told Bennett over the phone that the accommodation "was not going to help [plaintiff] with standing" and that she "need[ed] a chair." Plaintiff believed that the accommodations that Bennett identified in her letter were not accommodations for her difficulty standing.

On November 18, 2019, Dr. Williams signed a document stating that plaintiff should "limit standing to 2 hours with 15 minute [b]reak[s]," and she should not run or use stairs. Plaintiff testified that, despite her requests, she was not given any breaks or chances to limit her standing while working as an ID checker. Plaintiff elaborated that, when she was working as an ID checker in 2019, she asked Humphries if she could have a chair because standing was causing her pain, and Humphries "got upset with [her] about that." Humphries, according to plaintiff, told her that plaintiff "couldn't get a chair," that "[t]here would be no chairs to sit down," and "that was final."

Humphries testified that ID checkers could not have chairs for "safety reasons." He explained that ID checkers "have to be vigilant as a safety precaution," which requires them "to stand and greet and be vigilant at all times, forward and backwards." Chairs, Humphries elaborated, interfered with this because "if someone is sitting down," they may not notice "someone com[ing] up behind [them]," and they "could be injured in that way."

Plaintiff testified that in January 2020, she had foot surgery and went on medical leave until August of that year. Plaintiff returned to work in August 2020 and resumed her position as an ID checker. Plaintiff explained that she was cleared to return to work, but her doctor that cleared her to return was her "foot doctor," who "didn't know what job [plaintiff] was doing." Plaintiff's "foot doctor" was apparently Dr. Harvey Lefkowitz, who submitted a form to defendant on July 7, 2020, that authorized plaintiff to return to work on July 15, 2020, with "no restrictions." The form noted that plaintiff was previously unable to work due to "Foot/Ankle Problems," and that those problems had resolved.

Plaintiff testified that after she returned to work, she renewed her request for a chair, and Humphries denied her request again. Plaintiff claimed that, based on her experience doing the job, a chair would not have affected plaintiff's ability to perform the tasks that an ID checker must perform.

Plaintiff further testified that in September 2020, she had to take medical leave from work because her doctor believed that she needed to attend "a day treatment program" to help address severe mental-health issues. Plaintiff testified that defendant demoting her, the attendant loss of pay, and defendant ignoring plaintiff's repeated requests for an accommodation so she did not have to stand for long hours had taken a significant toll on her mental well-being, which caused her need to seek care.

While plaintiff was still on medical leave for her mental-health issues, she was evaluated by Dr. Harvey G. Ager. In a letter dated July 13, 2021, Dr. Ager wrote that he was hired by defendant to evaluate plaintiff, and he "attempted" to do so but plaintiff "was extremely uncooperative," so Dr. Ager's report was "extremely limited." In his report, Dr. Ager wrote that plaintiff told him, among many other things, that "[w]hen she last worked, she was working four hours sitting, four hours standing." This comment was largely irrelevant to the purpose of Dr. Ager's examination, which was a psychiatric evaluation to assess plaintiff's claim that she continued to suffer from mental-health issues that prevented her from returning to work.

On March 24, 2022, Bennett, writing on defendant's behalf, informed plaintiff that it received a request from plaintiff in "January 2022" asking to extend plaintiff's medical leave to May 2, 2022. Bennett wrote that defendant had already granted plaintiff three medical-leave extensions, the last of which extended plaintiff's medical leave—which started on September 24, 2020—until January 31, 2022. Bennett wrote that defendant was denying plaintiff's latest request to extend her leave and informed plaintiff that if she was not "released to work" soon, then she would be terminated. The letter also stated that defendant was willing to provide defendant with reasonable accommodations for plaintiff, if necessary.

On April 30, 2022, Dr. Vera Sekulov sent a letter to defendant stating that plaintiff "remains totally disabled vocationally." The letter asked that plaintiff's medical leave be extended to July 31, 2022, at which time plaintiff's "ability to return to work will be revaluated."

On May 3, 2022, Bennett sent plaintiff a letter informing her that defendant was terminating plaintiff's employment, effective that day. The reason given was "[f]ailure to return to work without just cause."

Plaintiff confirmed that she was on medical leave until May 2022, at which time defendant fired her. At the time of her deposition, plaintiff testified that it was her understanding that her physicians had still not "cleared" her to return to work due to mental-health concerns.

Plaintiff filed the complaint giving rise to this action on September 16, 2022, alleging in relevant part that (1) defendant retaliated against plaintiff for exercising her rights under Worker's Disability Compensation Act (WDCA), MCL 418.101 *et seq.*, in violation of that act and (2)

defendant violated plaintiff's rights under the Persons with Disabilities Civil Rights Act (PWDCRA), MCL 37.1101 *et seq.*, by failing to accommodate plaintiff's disability.[1]

Defendant eventually moved for summary disposition under MCR 2.116(C)(10), arguing in relevant part that all of plaintiff's claims failed on the merits. Turning first to plaintiff's WDCA-retaliation claim, defendant argued that plaintiff could not establish a prima facie case for retaliation because plaintiff had no evidence that defendant knew that plaintiff had engaged in an activity protected by the WDCA, let alone that she was terminated for that activity. Defendant further asserted that it had a legitimate reason for terminating plaintiff—she was unable to return to work—and plaintiff could not demonstrate that this proffered reason was pretextual because it was undisputed that plaintiff could not, in fact, return to work. As for plaintiff's failure-to-accommodate claim, defendant argued that it had accommodated plaintiff's inability to perform the agility test by offering her a position as an ID checker per the security officers' collective bargaining agreement. Defendant then stressed that it had accommodated plaintiff's medical conditions by granting her kneeling and lifting restrictions for her role as an ID checker, and it contended that it could not be held liable for refusing to give plaintiff a chair as an accommodation because plaintiff had never properly requested that accommodation. Defendant additionally argued that plaintiff's failure-to-accommodate claim had to fail because her disability related to her ability to perform the essential functions of a security officer or ID checker for defendant.

In response, plaintiff argued that a jury could infer from the evidence that defendant retaliated against her for seeking worker's compensation because defendant was aware of plaintiff's work-related injury and her seeking accommodation for the resulting impairment. For her failure-to-accommodate claim, plaintiff argued that she presented direct evidence for this claim because she testified that defendant never provided her with the chair that she repeatedly requested.

At a hearing on defendant's motion, the trial court delivered an oral ruling from the bench. For plaintiff's retaliation claim under the WDCA, the court concluded that plaintiff failed to present any evidence establishing a causal connection between a protected activity "and some alleged retaliation." The court further concluded that no reasonable trier of fact could conclude that defendant had a retaliatory motive when firing plaintiff considering that defendant extended plaintiff's medical leave for almost two years.

For plaintiff's claim under the PWDCRA, the court noted that plaintiff had been on medical leave since September 2020 and had never been cleared to return to work, so there was no evidence that plaintiff was able to perform the functions required for either a security guard or ID checker. As for plaintiff's argument that defendant failed to accommodate her disability by providing her with a chair to use, the court found that plaintiff had not provided any evidence demonstrating that she had requested a chair as an accommodation in writing.

---

[1] Plaintiff also brought three distinct claims under the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*, all of which the trial court dismissed. Plaintiff does not take issue with the dismissal of those claims on appeal, so this opinion does not discuss them further.

The trial court entered an order dismissing plaintiff's complaint on July 2, 2024. This appeal followed.

## II. STANDARD OF REVIEW

A trial court's ruling on a motion for summary disposition is reviewed de novo. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). Defendant moved for summary disposition in relevant part under MCR 2.116(C)(10). A (C)(10) motion tests the factual sufficiency of a claim. *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). In reviewing a motion brought under MCR 2.116(C)(10), all the facts are viewed in the light most favorable to the nonmoving party. *Id*. A (C)(10) motion is properly granted if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West*, 469 Mich at 183.

## III. ANALYSIS

On appeal, plaintiff argues that the trial court erred by dismissing her claims brought under the WDCA and the PWDCRA.

First addressing plaintiff's claim under the PWDCRA, "[t]o prove a discrimination claim under the PWDCRA, the plaintiff must show (1) that he is disabled as defined in the act, (2) that the disability is unrelated to his ability to perform his job duties, and (3) that he has been discriminated against in one of the ways delineated in the statute." *Peden v City of Detroit*, 470 Mich 195, 204; 680 NW2d 857 (2004) (quotation marks, citation, and alterations omitted).

At one point in its oral opinion, the trial court stated that defendant "granted" plaintiff an accommodation in which "[s]he was permitted to sit for four hours and then stand for four hours." The basis for this statement was presumably Dr. Ager's report, wherein the doctor wrote in July 2021 that "[w]hen [plaintiff] last worked, she was working four hours sitting, four hours standing." Plaintiff takes issue with the trial court's reliance on the statement from Dr. Ager's report, contending that it was inadmissible hearsay.

Regardless of whether the statement in Dr. Ager's report was inadmissible hearsay, it was error for the trial court to recite that statement as fact because there was at least a question of fact whether defendant offered plaintiff an accommodation in which "she was permitted to sit for four hours and then stand for four hours." Plaintiff testified that, despite her requests, she was not given any breaks or chances to limit her standing while working for defendant, so there was a question of fact on this issue.

That the trial court erred by relying on the statement from Dr. Ager's report does not warrant granting plaintiff appellate relief, however, because the statement from Dr. Ager's report was immaterial to the court's ruling. In dismissing plaintiff's claim under the PWDCRA, the trial court did not rely on the fact that plaintiff was allegedly accommodated by being "permitted to sit for four hours and then stand for four hours." The trial court instead reasoned that plaintiff's failure-to-accommodate claim had to be dismissed because plaintiff could not prove the second element of her claim. The court explained that defendant established that plaintiff's disability was

directly related to her ability to perform an essential function required of an individual working as either a security guard or an ID checker for defendant, and that plaintiff failed to proffer evidence creating a genuine issue of material fact as to *this* issue. The trial court also reasoned that, to the extent plaintiff's failure-to-accommodate claim was premised on defendant's failure to provide plaintiff with a chair, the claim had to be dismissed because plaintiff failed to provide any evidence tending to establish that she asked defendant for a chair in a written request, which the court opined was required to sustain a failure-to-accommodate claim under PWDCRA. Neither basis for dismissal relied on the statement in Dr. Ager's report about how defendant accommodated plaintiff's disability. Accordingly, the trial court's error of restating as fact a contested statement from Dr. Ager's report was immaterial to the trial court's reasons for dismissing plaintiff's claim under the PWDCRA.

As for plaintiff's retaliation claim under the WDCA, MCL 418.301(13) provides, "A person shall not discharge an employee or in any manner discriminate against an employee because the employee filed a complaint or instituted or caused to be instituted a proceeding under this act or because of the exercise by the employee on behalf of himself or herself or others of a right afforded by this act."

Plaintiff contends that the trial court erred by dismissing her WDCA claim because the court improperly relied on results from the agility test that defendant produced without first laying a proper foundation for the results, rendering the results inadmissible hearsay. This argument fails because defendant "did not have to lay the foundation for the admission of the [test results] in order for the court to consider them on a motion for summary disposition as long as there was a plausible basis for the admission of the [results]." *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 373; 775 NW2d 618 (2009). With a proper foundation, the test results would be admissible, so the trial court was permitted to consider the results. See *id*. at 373-374. Regardless, the evidence only needed to be substantively admissible—"it does not have to be in admissible form." *Id*. at 373. It follows that even if the test results themselves were inadmissible, the person who recorded the tests results would have been able to testify about the content of the results. Plaintiff is not contesting the substantive admissibility of the results but their form, and that is not a basis for granting plaintiff the relief she seeks.

That aside, plaintiff presumably believes that the trial court relied on the agility test results on the basis of the court's statement that "[d]efendant has supplied in their supplemental brief the details of these other employees['] [test results] and indicated some in fact were reduced to an ID checker job and some were not because they passed the test on subsequent tries." This statement, however, was immaterial to the trial court's reasons for dismissing plaintiff's retaliation claim under the WDCA. The court concluded that dismissal of plaintiff's WDCA-retaliation claim was proper because plaintiff failed to establish a causal connection between a protected activity and any alleged retaliation. The court further reasoned that the only adverse employment action that defendant took against plaintiff was firing her, and the court concluded that no reasonable trier of fact could conclude that the firing had a retaliatory motive given that defendant had repeatedly extended plaintiff's medical leave, and the evidence established that plaintiff had still not been medically cleared to return to work. Neither reason for dismissing plaintiff's claim had anything to do with the results of the agility test. Accordingly, whether the trial court properly considered those results had no bearing on whether the trial court properly dismissed plaintiff's WDCA claim.

This is all to say that, in her brief on appeal, plaintiff fails to actually address the trial court's reasons for dismissing plaintiff's complaint. As a result, even if both of plaintiff's arguments have merit, she would not be entitled to the relief she seeks. "When an appellant fails to dispute the basis of the trial court's ruling, this Court need not even consider granting plaintiffs the relief they seek." *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 381; 689 NW2d 145 (2004) (quotation marks, citation, and alteration omitted). Accordingly, because the arguments that plaintiff raises on appeal cannot provide her with the relief she requests, there is no reason to fully resolve plaintiff's arguments, and the trial court's dismissal of plaintiff's claims must be affirmed.

Affirmed.


/s/ Philip P. Mariani
/s/ Colleen A. O'Brien
/s/ Randy J. Wallace